Good morning and welcome. I'm Justice Sharon O. Johnson. I am joined by my colleagues, Justice Raymond Mitchell and Justice David Navarro. You will each be given 20 minutes in which to present your argument this morning, with the appellant having the opportunity to reserve time for rebuttal. As you approach, counsel, please state your appearance for the record and how much time you'd like for rebuttals. You may approach. Thank you, Your Honor. May it please the Court and counsel, I'm Robert Markfield and I represent Defendant Appellant Caleb Rallings. I would like to reserve, I'll say, five minutes for rebuttal. Very well. You may proceed. In this tragic case, Caleb Rallings, a young man of previously unblemished criminal history and an excellent work record as a seasonal employee of the Cook County Forest Preserve, drove his work truck at 1044 a.m. on June 30, 2018 at a speed of approximately 80 miles an hour down a road with a 35 mile an hour speed limit and plowed through the intersection and center line, causing numerous injuries and unfortunately one fatality. However, the State, in its prosecution for reckless homicide, failed to prove beyond a reasonable doubt that the actions or omissions of Rallings had caused the collision. Namely, and as specified by the State, his act of pressing his foot on the accelerator and failing to brake were voluntary. That is, bodily acts controlled by his conscious mind. Because Rallings was in the grip of delirium caused by dehydration, his actions were outside his conscious control. Rallings was thus similarly situated to a person suffering a seizure from a previously undiagnosed medical condition or to a person in the grip of an elaborate tick associated with Tourette syndrome, about which more shortly. The existence of dehydration-based delirium is supported just by overwhelming evidence to wit the unrebutted testimony of defense experts. I was supposed to say the testimony was unrebutted. The trial court gave three reasons in his oral ruling why he had issues with the expert testimony. Trial judge in this case was the finder of fact. He's the ultimate arbiter of the credibility of witnesses. Isn't it within his purview to reject an expert's testimony in whole or in part? We instruct juries on that all the time. Yes, technically yes, but I do think that there is an implicit condition that it be reasonable. And I don't think that it was reasonable to reject a highly experienced expert who testified that the defendant had this condition and that it caused this. Well, one of the problems is Investigator Rorman says I spoke to the defendant shortly after the accident in the hospital and he said X, Y, and Z. And the expert said it didn't happen. I don't believe you. That was his when confronted with the testimony. What is the finder of fact to do with that? Well, the expert I thought was entitled to express skepticism because he was getting a report, a secondhand report. What Rorman said, the undocumented report of what Rorman said that Taylor Railing said. But furthermore, I think that the trial court misunderstood and misconstrued the significance of that statement. I mean, Railing said that he blanked out that he didn't think it happened. That is consistent with delirium-based dehydration causing a break between conscious mind and physical action. But isn't one of the issues is that, and the expert testified to this, that the condition is on a spectrum. It ebbs and flows. And the trial judge credited this, right, said delirium was setting in. And this is the complexity of it. He's able to find his way to the restaurant. He stops at stoplights. He has a, tells the investigator afterwards he's afraid about losing his job or suggests a consciousness of an awareness of what happened. So it seems to me a little bit different than the sort of sleepwalking cases or the hypnotist, the typical sort of automatism. Yes, Your Honor, there's a lot to your question. I'd say in terms of the ebbs and flows, that's true he did say that. But I think that the expert made it clear that the general trajectory was downward. You don't get better from this unless you get treated. The general trajectory was downwards towards delirium, towards less coherence and comprehension. Is that why once he was given fluids, then his condition improved or changed markedly? Absolutely, Your Honor, absolutely. And I note that he was given a rapid administration of fluid, which is unusual because it can cause organ failure. But such was his state that he required that. And also when he gave that testimony, when he gave that alleged statement to Roman, he may have begun the sodium chloride treatment already. Roman did not know when it happened. Her initial answer was, I don't know when I spoke to Rallins. Then when prompted actually by the prosecutor, led actually, was it around 1130? Yeah, it was around 1130. It couldn't have been that early because Rallins didn't even arrive to the hospital until 1133. Now, we know from the court's findings of facts that Rallins began sodium chloride treatment at 1143. So it's very possible that if Roman was mistaken by just so much that she had spoken to him after he had begun this aggressive treatment and after he had begun improving. And also Rallins was sedated, and he might have been experiencing a slight uptick in coherence and comprehension after what happened. But in addition to all that, he said, he said, I blanked out. And that I think is consistent with a delirium, with a dehydration-based delirium that was so severe that it caused a break between a conscious act and bodily control, bodily action. The break was a loss of control. So he was conscious, and there was a physical act, but he didn't control it. Exactly. Control is the key concept. And I want to – this argument would be more difficult to make were it not for the Third District case of people being nelson, which I think is extremely salient. Because there, the defendant, he took actions that to an uninformed observer would seem to be really deliberate and sophisticated, especially compared to pressing your foot on the accelerator and failing to brake. This defendant in nelson made obscene telephone calls, three of them, over a period of a month, to a person whose name he chose at random from a telephone book. One would think sophisticated actions, but there was testimony that was unrebutted from an expert witness that this was the product, that this was the result of a – of Tourette's Syndrome that causes a complex motor tic. But isn't that case distinguishable because there had been, I guess, a foundation laid for that illness over a period of time? Whereas this, we're talking about, you know, maybe a few hours a day at most. I understand that. This wasn't a diagnosed condition in a way that favors railings, I think, over nelson because he could not have known ahead of time and taken steps to – He didn't know to drink water on a hot day. Well, he didn't know the results of not hydrating himself. He could not have anticipated that. And drinking water wasn't what was charged as the reckless act. It was pressing the accelerator and failing to brake. So here at nelson, there were physical acts. There was consciousness. There were both those things, I don't deny. But there was no conscious control. And so, I mean, I would respectfully submit that this court would have difficulty affirming without expressly rejecting the logic and holding of nelson. But to be clear, when you say the charged reckless acts are pressing the accelerator, he's conscious? He's conscious. There's no – well, he may say he blanked out. There's no testimony that he was asleep or unconscious when he's accelerating. That's right. That's true. And failing to brake. There was no testimony that he was passed out or unconscious when he crashed into the vehicles. That's true. Right? Actually, this is a technical question. Those acts weren't charged. They were orally stipulated. But it wasn't reckless based on cannabis. It wasn't reckless based on intoxication. That's right.  Okay. So the judge took the testimony of the expert and then also took the testimony of the witnesses that were in the truck with the defendant, with Mr. Raylings. Took the testimony of the investigator that spoke to him afterwards. So it's kind of – you can't exactly say it was unrebutted because he did have other testimony that would essentially contradict the testimony of the expert. Well, I do mean unrebutted by a state. By another expert.  I think that it's – But it's surely not the case that any time a defendant puts on an expert, if the state doesn't have an expert, the fact finder must accept the testimony of the expert. That's not – that's not the law. Of course, that's true, Your Honor. I do think that it's fair to point out that in Nelson, the appellate court there, found it significant that the expert was unrebutted. They were not. In the Kubis, which is a medical malpractice case, which – that was a case where the court was reviewing whether a certain jury instruction, whether it was error to give a particular jury instruction. And the question was, in that case, the medical basis for giving a particular instruction was unrebutted. It certainly wasn't anything akin to reversing on the basis of sufficiency and saying the fact finder must accept expert testimony. But in Nelson, it was. In Nelson, there was an expert. Yeah. Yeah, I agree. And I do want to say, I have to fault the trial court. It did its best. But I think it guttered – it had guttered an incorrect understanding of the law. And then as it applied to the facts, it did. I mean, I admit, first make it the correct – provide the correct definition. Bodily movement controlled by the conscious mind stated that. But then very shortly afterwards, the court defined voluntariness incorrectly as performing a physical act while conscious. So you have two definitions out there provided by the court. But then that latter control is absent in the latter definition. Exactly. Exactly. So to reverse, this case could be reversed within the confines of existing law. You're not arguing for a good faith extension. Yes, Your Honor. I do believe that, absolutely. The court misunderstood the law. And that is apparent in the court's exegesis as to the significance of the facts. The court really sort of focused on that his eyes were awake. He was – he negotiated the curve of the road. But those are sort of automatic or habitual acts. And even though they're conscious acts, they're not – they don't demonstrate control. They can just be – they can just be more or less automatic, which a lot of – as Mayor Kangas, the expert, testified, a lot of day-to-day, ordinary bodily movements are. Didn't the trial judge, at least on the motion we considered, conceded that this, in his mind, may well be a question of first impression and that it was really something akin to diminished capacity? Yes, Your Honor. I did not like that comment from the trial court because it simply was not a diminished capacity defense. It was a voluntariness defense. It was putting the State to the test. The State has the burden of proof beyond a reasonable doubt to show voluntariness. And I do have a quote from the court statement in the post-trial motion, and I think it's instructive. To quote briefly, at the end of the day, the court made a legal finding that a voluntary act is a physical act, which is the product of a conscious mind. The State proved beyond a reasonable doubt that Mr. Rallings was conscious at the time of the offense. There was no testimony that Mr. Rallings was unconscious at the time of the offense. So the court is really focused on was he awake or not awake. It wasn't focused on the crucial element of control that connects act to consciousness. Counsel, can you address, I guess, why we should ignore that there was some trace of THC in the urine? Yes, Your Honor. I think that you should ignore it as the trial court properly did because the THC was in the urine and not in the blood. The colorful quote from, I believe, one of the experts is that, you know, the bladder is the body's garbage can. And THC in the urine as opposed to the blood cannot affect behavior. And he was the medical plan and assessment upon arriving in the hospital. I mean, it is only only it isn't only Marikangas' testimony. There's also that. There was a he was diagnosed as, I believe, dehydration with acute delirium, and he was treated accordingly. There was just, I mean, the court rejected the notion that there was that THC had anything to do with his behavior and properly acquitted the defendant of aggravated DUI. That was that was a correct analysis, I believe. I want to talk about the following problem. It's arisen in case law, albeit under the rubric of proof, as somewhat definitionally overlapping concept of recklessness as opposed to voluntariness. Should there be criminal liability for defendants in reckless homicide cases who, for instance, were indisputably passed out at the wheel due to a condition such as epilepsy, fainting spells, or excessive drowsiness? As to these, I believe that provided that the offense is appropriately charged, it's fair to extend voluntariness back in time to when such a defendant got into the car, so long as the defendant knew he had a condition, diagnosed or otherwise, that if not appropriately managed or treated, put others at risk. So if a defendant has a diagnosed seizure disorder, is told you shouldn't drive, or if you drive, you should make sure you take your medications, and then neglects, drives, but doesn't take their medication and has a seizure, that, in your mind, criminal liability would attach? Yes, I'm distinguishing those cases from this one, where the defendant had no reasonable knowledge that these terrible consequences could ensue. Counsel, the day before, there were similar conditions where he worked in 90-plus degree heat, and when he returned home, his mother indicated that he was kind of, I think it was loopy that was used. Yes. So there was some indication of this condition prior to his deciding to drive his coworkers. Yes, and not to be flippant, I think that almost anybody who spends all day outdoors in that kind of weather might get a little bit loopy or loopy, as his mother said. I don't think that that is any sort of fair warning, that he has this condition that could erupt if he doesn't take a drink of water on the job. But in your view, that would have to have been specifically charged anyways, right? Yes, I think that it would have to be specifically charged. But even if it needn't be, I think that this case is distinguishable from those scenarios. There's another scenario I want to talk about. Counsel, your time has expired. You do have five minutes in order to present rebuttal. Okay, thank you, Your Honor. Oh, sure. Appearance for the record, please. May it please the Court, Counsel, Assistant State's Attorney Gina Savini on behalf of the people of the State of Illinois. Okay. Defendant has failed to establish here today that no rational trier of fact could find defendant guilty beyond a reasonable doubt. In fact, the people did prove defendant guilty beyond a reasonable doubt of the reckless homicide of Giuseppe Gazzano. And that the Court should – this Court should affirm the conviction because the record shows that Judge Martin had a correct understanding and applied the correct standard for a voluntary act. Plus, the evidence shows that what occurred here was a voluntary act. And the acts that we're talking about, obviously, are the speeding and failure to break. And defendant has no problems with the recklessness. He concedes recklessness. He just says that he's got an excuse, and that's that he was suffering from dehydration-based delirium. And in order to determine this, courts look at defendant's actions before, during, and after the crime. And here, Justice Mitchell, you've already hit on several of the clearly voluntary actions that this defendant committed that morning before the fatal crash. And even gone so far as to state that some of the conditions were probably known to defendant the night before, that he was not feeling well. He made a choice when he drove to Jersey Mike's. Although other people in the truck with him wanted to go to McDonald's, he made a choice to go to Jersey Mike's. He had to drive there. He needed to know how to get there. He had to operate the vehicle to get there. He went inside. He had to park the car, park the truck, turn it off. He ordered his food. And I would point out that when the expert testified in the defendant's case, he did concede that ordering food was probably a voluntary act. Didn't he take the meat out of the sandwich and put it in his pocket for later or something? One of the witnesses testified that he was doing something with the meat in his sandwich. That's correct. It's a little odd. It is odd. And even their expert said that acting strangely or acting weirdly was not hallucinating. That didn't necessarily mean that he was in the throes of delirium at that point. And quite opposite, what the expert said is that he was asked several times, when did this delirium begin? But didn't the trial judge himself acknowledge that delirium was setting in and progressing, right? You're not disputing that. I'm not disputing that. What do you make of this apparent, the fact that this issue of control wasn't expressly addressed by the trial court? He focused on consciousness and he focused on physical act, but the critical point of control seems to have not directly been addressed. Well, I would point the court to the trial court's comments. And in making his findings, he methodically went through all the elements of this crime and all the necessary burdens that the State had to prove. And in doing that, when he got to the point of conscious control, he referred to, well, first he cited People v. Ulrich and drew the similarities between those two cases. That's a murder case, it was a jury, and the defendant was found to be in control of his actions. He then moved on to what the statute says the definition of a voluntary act is. Clearly the court knew this. And I should back up a minute. There's a presumption that the court knows the law, and the defendant has failed to overcome that presumption here today. But the court took it further, and the court then gave examples of People v. Grant, People v. Martino. In Martino, you had a domestic battery case where the defendant was tased upon the police entering. And he... Right, so the defendant was conscious. He was conscious. And he had a physical act. But it was the result of electronic stimulus. Exactly, involuntary control over his muscle reflexes. And the court understood that. He cited that case himself. He cited Grant himself. It's not as if the court looked at any of these one factor in a vacuum. The court was well aware of what the law is. And that is explicit when he says, after citing the case law, bodily movements are a product of a controlled, conscious mind. And he does talk about control. The fact that he hits on the fact that the defendant is conscious, well, that's certainly a requirement. It's definitely a good start in the inquiry, but it doesn't end there. And the court does show the reviewing court that he was aware of what a conscious act was. And he does that through his knowledge and the fact that he provides the case law so this court will know what it was that he was relying on. The fact that defense wants to just kind of cherry pick certain parts of either his comments in the motion for a new trial or his comments during his findings, you have to take the court's ruling in the totality of all of his findings. You cannot just look at one section. What do you make of the analogy to the Nelson case and this notion that it's unrebutted expert testimony? You didn't have an expert that contradicted this? An expert wasn't necessary. As Justice Navarro stated, and I believe you yourself stated, the law is very clear on that. The beauty of an expert witness is that they get to testify to the ultimate fact. The beauty of that for the trial of court, the trial court, is they get to completely reject that. They're in a special situation that no other witness is in. And I'm not even suggesting that his testimony was wholly rejected. It could be rejected in part, in whole. That's up to the trial court. And I think you also pointed out that the trial court, and so did Justice Navarro, made many credibility findings there where he took issue with what this expert was testifying to. Remember, this is an expert who, when he came into this case, two years after writing his first report, because defense counsel told him to take the word insanity out, he took the word insanity out. I mean, what credibility does a witness have that does that? Well, in some jurisdictions, automatism defenses are addressed under insanities. Correct, correct. But here, I mean, I think it's very clear that any type of diminished capacity is not the law. And Judge Martin was fully aware of that, and he talked about it several times. And this also was an issue. This case was pending on this Court's call for five years. Justice Patar handled it initially, and then Justice Martin ordered all those transcripts and read everything of all the hearings that were held on the state's motion to bar an expert. So he was very aware of what Dr. Merrick Angus was going to testify to. He understood all that. He was aware of all the case law that defense counsel presented to him, and that was definitely argued throughout this case pretrial. This was litigated pretrial. And all of that litigation shows that this Court understood. But isn't there just big picture? Isn't there a problem with it? Here you have a defendant who otherwise has lived a blameless life, has a medical condition on a given day, and there's a tragic accident. Isn't there some pause for saying that in that situation where everybody agrees he had some dehydration-related delirium, that he should carry a felony conviction for that? Good people need to be held responsible for their criminal actions on any given day. So I would argue that his actions in this moment is what this Court is concerned about, and it's what the trial court was concerned about. And taking us back to what happened immediately before the crash, this defendant chose to stop at the light at Arlington Heights Road. Now, remember, he's in a dual turning lane, left-hand turning lane. And what does Mr. Butler say to him? This is a bunch of 40- and 50-year-old men in a force-preserved truck being supervised by a 20-year-old man who's already driven erratically a couple of times in the morning going to Jersey Mike's. What he says to him is, listen, I know you have a lead foot, and I'm fine with that as long as you know where the brake is. And what did this defendant do? He decided that this was time to take a captive audience on a joyride in a 14-ton force-preserved truck. He didn't like that comment by Mr. Butler, so what he chose to do when the light turned green is he maneuvered his way, maneuvered his way through two lanes of traffic. And Mr. Butler described that as plain chicken. He didn't hit one of those cars. He's driving a 14-ton truck and getting in and out of cars until he got to the head of the heap. When he got there, what did he do? He accelerated. He put his foot on the gas, and he sped up. All the people in the truck at that point said to him, please stop, please slow down. He ignored them, and he smiled at them. How could we say that those weren't voluntary actions? So what we're saying then is that he was consciously choosing to navigate this, consciously choosing to drive recklessly in the face of, because these other, whether it was in defiance to the passengers or for the fun of it, that's the state's position. He definitely made a conscious decision to weave his way through that traffic successfully and then accelerate, even though the judge is acknowledging that he's some delirium. He's saying delirium is studying it. What that is, and I think Maragany says it's on his fucking head. It's not that there's a bright line that he was not delirious and now he is delirious, but it's kind of this ebb and flow that we've been talking about.  So then at some point he's, as delirium is setting in, that's what Judge Harden says, now this is happening with the passenger saying, hey, don't drive like this. Hey, you shouldn't be doing this. And he's acting, you would say, recklessly, least erratically, dangerously to be sure. Correct. But those are voluntary actions. Those are voluntary acts, and here's why this can coexist with the expert's testimony. It's because unlike Nelson, where Tourette's is basically an incurable disorder, where that expert unequivocally said that the defendant in Nelson could not control his actions, just couldn't be done, and that was unrebutted. Here we have the beauty of having eyewitnesses in the actual cab of the truck. Very rarely in these cases is there anyone in their car, when there are car cases, reckless cases, that there's passengers. Here we had eyewitnesses to these events. We know what type of body movements and whether or not the defendant said anything leading up to the crash. And all of his nonverbal communication with the people in the car showed that he was in control. He was defiant, and he decided that this is what he was going to do. How do you explain him being able to maneuver? This isn't picking a phone number and a person out of a phone book over and over and over again, which clearly, that's part of that particular disorder. This is dehydration. So the fact that he was able to control his physical movements, I mean, think about it. Mr. Butler testified, he wasn't that big of a guy, and he's trying to drive. The defendant wasn't that big of a guy, but he's trying to control this huge truck. And he did it successfully. Every single time that he drove recklessly or erratically, he somehow was able to stop in time. He made all of those conscious decisions. And here, when he started to make, when he started to speed up, I don't know if he knew a curb was coming up. I'd submit he probably didn't know. But it was too late by then because he couldn't control the car anymore. We know that he was in control of it because one of the witnesses, who was literally a sitting duck on the other side of this red light in oncoming traffic, said, I saw this car coming so fast, or this truck coming so fast at me. And what does she say? I don't think he was on drugs or drunk. I don't think he was having a heart attack because he was able to maneuver that curve of the road. So he was still able to maneuver the curve right before, right before he crossed over the median. And, of course, we know that from the physical evidence. The construction, the crime scene construction experts testified about the yaw marks in the road. So we know where that truck crossed over. It was right there at the median. You can look at the photographs and see all the marks right across the median on the north side of the lights when he finally loses control. And he cannot maneuver that curve anymore. This would have been very difficult to drive at this speed without control of that truck. The data center from the vehicle says he's not even applying his brakes. They can only go back five seconds. So it's a very quick blip of what we were able to glean from the physical data from his truck. But, yes, he was accelerating. And even when you look at the acceleration pressure, which is different than acceleration, the truck did start to slow down. But it wasn't because he took his foot off the accelerator. It's because it became, it came into contact with other things. Here, probably the median first before it went airborne. But doesn't that almost seem to argue against being in control? Well, anyway, just if you're in control and you see you're about to hit something, you pull back from it. No, it illustrates his recklessness that he did not anticipate this curve. And when the curve came up on him, it was too far gone. He wasn't going to be able to control or pull back on this. And, you know, I would point out that at no time did anybody ever say, I mean, we talked about being blanked out. He never lost consciousness. And we know that because we have witnesses. And I think it's important that what the justices have said here today is that this was a decision for the trier of fact. This was rebutted evidence. There are so many factual things that occur. So at the very least, there's some evidence from which a rational trier of fact could convict. Absolutely. And that's why there's no way that the defense even comes close to meeting the burden that any rational trier of fact could find him guilty. Obviously, he could. And obviously, Judge Martin did. And one of the things I wanted to say about the IV, it is unsure. We are unsure when the fluids were given to him. But what we can look at to kind of deduce, we know he got there at 1130. We know that Officer Roman got there very soon after. And when asked where the people in the crash were located, she was directed to him first. So she got to him first. And you don't get to pick and choose. And that's what this expert did a lot here. He chose the things in reports or everything that he based his decision on came from witness accounts or police reports or medical documents. Judge Martin got his information from the horse's mouth. He got testimony under oath from witnesses who were there and saw what happened that day. And I am not disputing that the defendant acted irrational after the accident. But so much of that is telling. When he gets out of the car after the crash, before that, he's approached by one of the officers, and he has a responsive conversation with them. He isn't agitated yet. He isn't screaming yet. He isn't chanting yet. That doesn't come right away. He gets out, and of all the people that he could choose to go up to, he picks Mr. Butler and says, we ain't dead yet. He knew he was alive. That's what that sentence means, we ain't dead yet. And I'm guessing that when he got out of the truck, he was able to see the mass destruction that he had caused. Now, that might have shook him to the bone. And he might have started realizing, I caused this. This is my fault. He knew he was the driver. He knew he was the one that caused the crash. And just in case he didn't, Mr. Butler told him, you almost killed us. And what did he do? He gets in a verbal altercation, and he wants to go after Mr. Butler. That's totally appropriate behavior. Officers come. They intercede. And all they're trying to do is kind of wiggle their way in between so he can't get past to get to Mr. Butler. But he resists. He's not attacking the police. Even the officer said, he wasn't fighting us. He was wrestling us. He just didn't want to be handcuffed. And now is when he starts yelling that I see Jesus. I see God. I saw three blind mice. So maybe, maybe now, maybe this slippery slope delirium that even the expert describes that way, and that's why this is a different thing. It's going to be similar to some of the seizure cases because if you're not in the throes of a seizure, then you could have control over your actions, correct? We see that in several cases. Counsel, if you could begin your closing, please. Of course. So because the court is the trier of facts, the things that the expert testified to this case were all subject to interpretation by Judge Martin. He was the one that got to draw the reasonable inferences, and he is the person that gets to decide credibility. Clearly, this expert thought he would decide credibility of several things or dispute several things on his own, and that wasn't his job. That was Judge Martin's. Based on all of these facts and findings, defendant was proven guilty beyond a reasonable doubt, and the court properly found defendant's speeding and failure to break were voluntary acts. Any rational trier of fact could have found defendant guilty when the evidence is viewed in the light most favorable to the people. I would ask that this Court affirm the defendant's convictions. Thank you. Counsel Robado? Thank you, Your Honor. A few points. First of all, I do think in assessing witness statements as to Mr. Raylon's actions, I think that it is very appropriate to distinguish, as the expert did and the trial court to a certain extent, his actions before lunch and after lunch. He was driving recklessly before lunch, but as he drove to the restaurant, he was heeding the – he ultimately heeded the requests of the people in the car, slow down, stop at the red lights. He did those things. Even though he was driving crazily and the people were upset. After lunch, after lunch, he was clearly in a much worse state, a loss of contact with reality, basically. He made some total non sequitur about going to play basketball. He smiled in response to the, you know, screams and shouts of the people in the car, which suggests, you know, just a loss of contact with reality. He is in his own world. These are things that have to be interpreted, right? And they're within the province of the trier of fact. Yes, Your Honor. So that's a jury or in this case a bench trial and a trial judge. Yes, Your Honor, that is true. Your Honor, I just want to make it clear that the witness – nothing any witness has said is necessarily contradicts the expert's testimony. There's evidence from which a trier of fact could have acquitted, but there's also evidence from which a reasonable trier of fact could have convicted, which is what happened here. And, you know, under the standard we have to take it, the evidence is the light most favorable to the state. That's a pretty tough standard. I mean, I don't think we have an error of law in terms of the trial judge certainly articulated the correct legal standard, and as Counsel said, he walked through in great detail a number of cases in this area. I think, first of all, it is true, and I don't deny the burden on appeal, which is formidable. But I always think it's important to balance light most favorable on appeal with the state's burden of proof beyond a reasonable doubt. Don't lose sight of that, Your Honors, please. Because, you know, in Nelson and in many other cases, reasonable doubt reversal, even light most favorable to the state, was justified by the facts. I think the facts, nothing that any witness said about what he was doing contradicted that he was in a state of deep delirium that caused a breach between behavior and action, the element of control. That he was following the curve of the road is just something that drivers do more or less automatically, and even dodging in and out of traffic, I mean, that's just almost like something that somebody does also automatically, like a video game. It doesn't take deliberation, thought, reflection. It is a more or less automatic action. And as Your Honor stated, I mean, even a person deep in the throes of a medical crisis or mental illness would just reflexively slam on the brakes as he approached an intersection at a huge rate of speed with what? Courage inevitable and painful injury, and that's likely. But he did not even touch the brake, suggesting his mental condition was such that he had lost control, that he was no longer in conscious control of his actions. So how far back would you go in this time frame with respect to his not being in control? Was it immediately before the collision? Was it when he first got in the car and started driving? At what point are we supposed to believe that he lost control? Well, Mayor Kangas said after lunch, and that does some sort of, I mean, I don't think that's in any sense arbitrary because there was a period of time. I don't think the record is clear how long, but let's say 20 minutes, 30 minutes while he ate his sandwich and picked the meat out of it and put it in his pocket and all those strange things. There was a big length of time for delirium to really set in. So I think that Mayor Kangas was not just cherry-picking when he said he was not delirious before lunch, but after lunch he was. And as I said, the facts bear that out. Before lunch he heeded the requests of his passengers, stop, please stop. He was driving crazily, but he listened to them. After lunch, he smiled at them. So you're saying he was on automatic driving for about 20 minutes? Well, I'm just speculating that there was a 20-minute lunch period. So he was on automatic the entire time he was driving after lunch? Afterwards. There was this interval between before lunch and after lunch, mainly lunch, that allowed his condition to change from being delirious perhaps, but in conscious control, to being no longer in conscious control. That was a clear break, a temporal break you might say, for his condition to just deteriorate substantially. And the facts bear that out. Council, I'm going to ask this question. I guess it's sort of a big-picture question. How do you reconcile that he received 24 months probation and there were people who lost their lives and people who were injured such that their lives will not be the same going forward? How do we reconcile that? Yes, Your Honor. I mean, whatever penalty the court imposes doesn't bring back the lives of the people who are lost. I mean, that is like a tragedy that there are no words to sort of appropriately apply. But on the issue of criminal liability, is it fair to impose that to somebody who is not in control of his actions and had no reason to believe that he would lose control of his actions? I mean, I understand that it's a very hard thing for family members of the bereaved to bear when a conviction is thrown out or when there's an acquittal issue, but I think that is the responsibility of the courts when appropriate. That's all I have. Any questions, Your Honors? Any questions? No. Thank you. Thank you very much. I think you both did an excellent job with advocating for your positions. We will certainly take it under advisement and issue our ruling as soon as we are able.